UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRYANT KEITH DAY,

          Movant,

                                      File No.  1:07-CV-768

v.

                                      HON. ROBERT HOLMES BELL

UNITED STATES OF AMERICA,

          Respondent.

_____/


**O P I N I O N**

This matter comes before the Court on Movant Bryant Keith Day's motion for relief under 28 U.S.C. § 2255.  For the reasons that follow the motion will be denied.

**I.**

On July 21, 2005, Bryant Keith Day was charged in a six-count indictment with various gun and drug violations occurring on June 8, 2004, and May 30, 2005.  (*United States v. Day*, File No. 1:05-CR-176, Dkt. No. 1, Indictment.)  A superseding indictment was filed on September 22, 2005, adding an additional drug violation and an additional gun violation.[1]  (File No. 1:05-CR-176, Dkt. No. 18, Superseding Indictment.)

---

[1]The superseding indictment charged Day as follows:  Count 1, possession with intent to distribute marijuana on June 8, 2004, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D); Count 2, possession of cocaine base on June 8, 2004, in violation of 21 U.S.C. § 844(a), (c); Count 3, felon in possession of firearms on June 8, 2004, in violation of 18 U.S.C. §§ 922(g)(1), 921(a), 924(a)(2); Count 4, possession of a firearm with an obliterated serial (continued...)

The Court appointed Assistant Federal Public Defender Sharon Turek to represent Day.  (File No. 1:05-CR-176, Dkt. Nos. 3, 8.)  On October 24, 2005, the Court permitted Kevin Floyd to substitute in as retained counsel pursuant to a stipulation for substitution of counsel.  (File No. 1:05-CR-176, Dkt. Nos. 19, 22.)

The case went to trial.  On January 27, 2006, the jury returned a verdict finding Day guilty on all eight counts.  (File No. 1:05-CR-176, Dkt. No. 61, Verdict.)  Day was sentenced on June 5, 2006, to concurrent thirty-six-month prison terms on all counts except the two § 924(c) firearm charges, for which Day received mandatory minimum consecutive prison terms of ten years under § 924(c)(1)(A)(iii) for discharging a firearm during and in relation to a drug trafficking crime, and twenty-five years under § 924(c)(1)(C)(i) for the second conviction under § 924(c).[2]  (File No. 1:05-CR-176, Dkt. No. 67, J.)  Day filed a

---

[1](...continued)
number on June 8, 2004, in violation of 18 U.S.C. §§  922(k), 921(a)(3), 924(a)(1)(B); Count 5, use and discharge of a firearm during and in relation to a drug trafficking offense on June 8, 2004, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); Count 6, possession of cocaine with intent to distribute on May 30, 2005, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); Count 7, felon in possession of a firearm on May 30, 2005, in violation of 18 U.S.C. §§ 922(g)(1), 921(a), 924(a)(2); and Count 8, use of a firearm during and in relation to a drug trafficking offense on May 30, 2005, in violation of 18 U.S.C. § 924(c)(1)(A)(i). (File No. 1:05-CR-176, Dkt. No. 18, Superseding Indictment.)

[2]The relevant sentencing provisions under § 924(c) for using a firearm during or in relation to a drug trafficking crime are as follows:

(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses

(continued...)

notice of appeal, but his appeal was dismissed for want of prosecution.  (File No. 1:05-CR-176, Dkt. Nos. 72, 74.)

Day filed this § 2255 claim within one year of the dismissal of his appeal.  He contends that he received ineffective assistance of counsel because trial counsel failed to communicate the government's plea offer to him.  By way of relief Day requests the Court to vacate the judgment and allow him to enter into the plea agreement proposed by the government prior to trial.  (Dkt. No. 1, § 2255 Mot. 4.)  Acceptance of the government's last plea offer would result in the dismissal of one of the § 924(c) charges and would eliminate the mandatory twenty-five-year consecutive prison term under § 924(c)(1)(C).

## II.

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such sentence, that the sentence was in excess of

---

[2](...continued)
a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

    (i) be sentenced to a term of imprisonment of not less than 5 years;

    . . . .

    (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

. . . .

(C) In the case of a second or subsequent conviction under this subsection, the person shall--

    (i) be sentenced to a term of imprisonment of not less than 25 years.

18 U.S.C. § 924(c)(1).

the maximum authorized by law, or that it is otherwise subject to collateral attack.  28 U.S.C. § 2255.  To prevail on a § 2255 motion "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict."  *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (quoting *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)).  An ineffective assistance of counsel claim is the proper subject of a § 2255 motion because it implicates the Sixth Amendment right to counsel.  *See Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).

As a general rule, claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review unless the petitioner shows cause and prejudice. *Massaro v. United States*, 538 U.S. 500, 504 (2003) (citing *United States v. Frady*, 456 U.S. 152, 167-68 (1982), and *Bousley v. United States*, 523 U.S. 614, 621-22 (1998)).  However, the procedural default rule does not apply to a claim of ineffective assistance of counsel.  *Id.* A claim of ineffective assistance of counsel may accordingly be raised in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal.  *Id.*

"To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must establish two elements: (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different."  *Griffin*, 330 F.3d at 736 (citing

*Strickland v. Washington*, 466 U.S. 668, 694 (1984)).  The right to effective assistance of counsel extends to plea negotiations.  *Humphress*,  398 F.3d at 858 ("Defendants have a constitutional right to effective assistance of counsel during plea negotiations.").  "A defense attorney's failure to notify his client of a prosecutor's plea offer constitutes ineffective assistance of counsel under the Sixth Amendment and satisfies the first element of the *Strickland* test."  *Griffin*, 330 F.3d at 737.  "The second element of the *Strickland* test in the plea offer context is that there is a reasonable probability the petitioner would have pleaded guilty given competent advice."  *Id.*

In conjunction with his § 2255 motion Day submitted a declaration stating that "Attorney Kevin Floyd never told me that the government had made any plea offer.  In fact, Kevin Floyd never once told me that I could reduce the amount of time that I would have to spend in prison if I pleaded guilty under any terms."  (Dkt. No. 10, Day Decl. ¶ 5.)  In response, the government represented that it made two plea offers while Day was represented by Mr. Floyd, and that Mr. Floyd orally confirmed to the government that he communicated those offers to Day.  (Dkt. No. 6, Gov.'s Resp. 1.)

Day's ineffective assistance of counsel claim raises issues of fact regarding the communications between Day and Mr. Floyd.  "'Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.'"  *Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) (quoting *Turner v. United States*,

5

183 F.3d 474, 477 (6th Cir. 1999)).   An evidentiary hearing was accordingly held on February 29, 2008.

## III.

At the evidentiary hearing the Court heard testimony from Movant Bryant Keith Day, and the three attorneys who represented him at various times in connection with these charges:  Lawrence Phelan, Sharon Turek, and Kevin Floyd.  The Court also admitted the documentary evidence attached to the government's response in opposition (Dkt. No. 6, Attach. A-J; Gov.'s Ex. A-J); documents from Mr. Floyd's client file for Day (Gov.'s Ex. K-O); Day's declaration (Dkt. No. 10, Ex. A; Gov.'s Ex. P); and a log of attorney visits to Newaygo County Jail (Mov.'s Ex. 1).  The Court relies on all of this evidence as well as its own recollections of pre-trial and trial proceedings in this case in making the following findings of fact.  *See Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) ("[W]hen the trial judge also hears the collateral proceedings . . . that judge may rely on his recollections of the trial in ruling on the collateral attack.").

Day retained Mr. Phelan to represent him after he was arrested by state authorities in connection with the June 8, 2004, incident.  Mr. Phelan testified that because he understood that drug and firearm charges would eventually be filed in federal court, he contacted Assistant United States Attorney Phillip Green to discuss a pre-indictment resolution of the potential federal charges.  Mr. Phelan obtained an offer which would have enabled Day to plead guilty to a single felon in possession of a firearm count and would have avoided the

6

potential drug charges. Mr. Phelan testified that Day was obstinate and was not inclined to accept any plea offers.

Day was subsequently arrested by state authorities in connection with the May 30, 2005, incident. Mr. Phelan obtained a second plea offer that would have resolved the drug and firearm charges stemming from both incidents and would have avoided a § 924(c) charge. Mr. Phelan testified that he met with Day and his family, communicated the plea offer, and tried to educate them on the possibility of a federal § 924(c) charge and the seriousness of such a charge. Day and his family, however, indicated that they were not interested in a plea or in cooperation. Mr. Phelan had no further contact with Day after his arrest on the federal charges on July 29, 2005.

Day testified that he wanted Mr. Phelan to represent him on the federal charges. However, he testified that he did not recall Mr. Phelan presenting any plea offers to him.

On August 1, 2005, immediately after Ms. Turek was appointed to represent Day, the government sent Ms. Turek a letter advising that although Day was charged with only one § 924(c) violation, the evidence supported a second charge under § 924(c) involving discharge of a firearm, and that the combination of the two § 924(c) charges would subject Day to a mandatory minimum consecutive sentence of thirty-five years in addition to the sentences he would receive for the other counts in the indictment. The government offered to allow Day to plead guilty to one § 924(c) charge, carrying a five-year prison term, and a low level drug charge. (Gov.'s Ex. B.)

Ms. Turek went over the government's letter with Day.  She explained the plea offer and the potential consequences Day would face if the government obtained a superseding indictment adding a second § 924(c) charge.  Day acknowledged that Ms. Turek went over the government's letter with him.  He testified that he did not accept the plea offer because he did not trust Ms. Turek and he wanted Mr. Phelan to represent him.

Ms. Turek was able to obtain a second plea offer that was more favorable to Day.  The government orally agreed that it would dismiss the § 924(c) charge in exchange for a plea to a drug charge carrying a guidelines range of less than three years if the plea was accepted before the government returned to the grand jury to seek a superseding indictment.  Ms. Turek considered this an excellent offer.  She discussed the offer and the guidelines with Day and recommended that he accept the offer.  She also spoke with Day's family for over an hour and arranged for an emergency mid-week visit at the Newaygo Jail so that Day's family could discuss this plea offer with Day before the time limit on the offer expired.

Day acknowledged that Ms. Turek, her investigator, and his family all tried to convince him to take the second more favorable plea offer.  He testified that he did not did not accept the offer because he had already spoken to Mr. Floyd, and Mr. Floyd told him he had a great chance of beating the charges because Mr. Floyd had beaten Mr. Green in a previous case.

On September 22, 2005, the government filed a superseding indictment which included a charge under § 924(c)(1)(A)(iii) for discharge of a firearm in relation to a drug trafficking crime, which carries a mandatory minimum consecutive ten-year sentence. As the government had warned in its August 1, 2005, letter, the superseding indictment effectively added a thirty-five year mandatory minimum consecutive sentence if Day was found guilty on all charges.

Mr. Floyd filed his appearance on October 14, 2005. (File No. 1:05-CR-176, Dkt. No. 22.) He discussed the superseding indictment and the penalties for each count with Day, as memorialized in the notes he made on the superseding indictment during his discussion with Day. (Gov.'s Ex. K.)  During the discussion Day told Mr. Floyd that Ms. Turek had obtained a plea offer with a 21-27 months guidelines range, as evidenced in Mr. Floyd's notes. (Gov.'s Ex. O.) Mr. Floyd testified that Day told him that he was not happy with Ms. Turek because her discussions focused on sentencing rather than on winning. Day told Mr. Floyd him that the plea offers he had received were unacceptable because he did not want to be sentenced for anything. He wanted to go to trial and he wanted to be acquitted on all charges.  Mr. Floyd testified that it was his understanding, based upon his conversations with Day and Day's family, that he had been hired to take this case to trial.

On November 28, 2005, the government faxed Mr. Floyd a plea offer which would have allowed Day to plead guilty to Count 3,  felon in possession of firearms, and Count 5, discharge of a firearm during and in relation to a drug trafficking offense, which carries a

ten-year mandatory minimum consecutive sentence.  (Gov.'s Exs. E, L.)  Mr. Floyd testified that although the government's November 28, 2005, plea offer was to expire on December 1, 2005, he obtained an extension of time to respond to the offer.  Mr. Floyd testified that although Day was not interested in plea offers, he felt comfortable discussing plea offers with Day because Day trusted him.  Mr. Floyd does not have a specific recollection of when he discussed the government's November 28, 2005, offer with Day.  Nevertheless, Mr. Floyd testified that he spoke with Day about the plea offer sometime before his scheduled December 5, 2005, meeting with the government to discuss the plea offer and proposed stipulations.  (Gov.'s Ex. F.)  According to Mr. Floyd, Day rejected the offer because any mandatory consecutive sentence was unacceptable to him.

At the status hearing on December 8, 2005, in Day's presence, Mr. Floyd advised the Court that he was at the point of being able to competently discuss a potential plea agreement with Day.  Mr. Floyd visited Day at the jail on December 10.  (Mov.'s Ex. 1.)

On January 18, 2006, the government faxed Mr. Floyd its last plea offer.  The offer required Day to plead guilty to Counts 1 and 6, possession of marijuana and cocaine with intent to distribute, and to Count 5, discharge of a firearm during or in relation to a drug trafficking crime, which carries a ten-year mandatory minimum consecutive sentence.  It also required Day to cooperate with the government.  The deadline for accepting the offer was 5:00 p.m. on January 19, 2005.  (Gov.'s Exs. G, M.)  The jail log reflects that Mr. Floyd visited Day at the Newaygo jail the next morning.  (Mov.'s Ex. 1.)  Mr. Floyd testified that

10

during this visit he communicated the government's offer to Day.  According to Mr. Floyd, Day was not interested in the plea offer and rejected it because he did not want to cooperate with the government or be a snitch for the police.

Day testified that Mr. Floyd never talked to him about the November 28 plea offer or the January 18 plea offer.  Day testified that when Mr. Floyd met with him on January 19 they discussed the defense and how Day should sit at trial, but they did not talk about the plea offer.  According to Day, Mr. Floyd never talked to him about any plea offers, and when he asked Mr. Floyd about plea offers, Mr. Floyd told him not to worry about it because he did not answer Mr. Green's telephone calls.  Day testified that if Mr. Floyd had told him about the government's offer to let him plead to an offense carrying a ten-year mandatory minimum consecutive sentence he would have accepted the offer.

In order to determine whether Day has met his burden of showing that Mr. Floyd failed to notify him of the government's plea offer, the Court must sort through the conflicting testimony offered by Day and Mr. Floyd.

Day testified that after he was found guilty on all charges at trial, Mr. Floyd failed to show up for the presentence interview, failed to provide Day a copy of the presentence report until the day of sentencing, and failed to prosecute his appeal.  Day contends that it logically follows from these failures that Mr. Floyd also failed to follow through on communicating the plea offers.

11

While the Court agrees that many aspects of Mr. Floyd's representation reflected a lack of diligence, those failures do not support an inference that he failed to communicate the government's plea offers.

Day's testimony as a whole was not credible. Day's lack of candor was evidenced by his denial that he owned the cocaine in Brian Rieffer's car, his insistence that he would have nevertheless sworn to ownership in order to obtain the benefits of a plea bargain, and his later admission that the cocaine in the car was his. His lack of candor was also evidenced by his testimony that he would have cooperated with the government, while at the same time asserting a lack of memory as to the individual from whom he purchased his cocaine and marijuana. His selective memory was also evidenced by his lack of recall concerning the plea offers presented to him by Mr. Phelan.

Mr. Floyd's testimony was not completely credible, either. For example, Mr. Floyd's testimony that he presented the November 28 plea agreement to Day prior to December 5, 2005, is undermined by other evidence in the record. The jail log does not reflect any visits by Mr. Floyd to the jail between November 28 and December 5, 2005. Mr. Floyd testified that it is not his practice to discuss much with his clients over the telephone. There were no court hearings between November 28 and December 5 that would have brought the two men together, and there is nothing in Mr. Floyd's notes to substantiate a discussion about the plea offer. The Court accordingly doubts the accuracy of Mr. Floyd's testimony that he discussed the November 28 plea offer with Day prior to his December 5 meeting with the government.

Nevertheless, while Mr. Floyd may not have been accurate about the timing of this conversation, the evidence suggests that it is very likely that Mr. Floyd discussed the plea offer with Day after the December 8 status conference when the plea offer was referenced on the record, or during Mr. Floyd's December 10 jail visit.  Moreover, even if Mr. Floyd did not affirmatively broach the subject of the November 28 plea offer with Day, Day was on notice as of December 8 that a plea offer had been made.  Based upon his prior representation by Mr. Phelan and Ms. Turek, Day had an understanding of what a plea offer was.  He could have questioned Mr. Floyd about it if it had been of any interest to him.

The Court also finds that Mr. Floyd communicated the January 18 plea offer to Day. Mr. Floyd's testimony on this issue is supported by the evidence that Mr. Floyd went to the jail to talk to Day early the next morning after receiving the plea offer.  The unrefuted evidence that Mr. Floyd discussed the oral plea offer obtained by Ms. Turek also supports a finding that contrary to Day's testimony, plea offers were among the topics Mr. Floyd discussed with Day.  The Court concludes, based upon the evidence as a whole, that Day's testimony that Mr. Floyd never communicated the government's plea offers to him is not credible.  Accordingly, Day has not satisfied his burden of showing that Mr. Floyd failed to notify him of the government's plea offers.

Moreover, even if Mr. Floyd failed to notify Day of the government's plea offers, Day has not met his burden of showing that there is a reasonable probability that he would have pleaded guilty had he known about them.

Day contends that because of the large disparity (twenty-five years) between the penalty under the plea offer and the penalty attached to the indictment, he is entitled to a presumption that he would have accepted the government's plea offer had he known about it.

The Sixth Circuit has recognized that in the absence of evidence to the contrary, "'a substantial disparity between the penalty offered by the prosecution and the punishment called for by the indictment is sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer.'" *Griffin*, 330 F.3d at 737 (quoting *Dedvukovic v. Martin*, 36 F. App'x 795, 798 (6th Cir. 2002)).   In *Dedvucovic* the court noted that "the district court did not err in relying on such a disparity, along with the unrefuted testimony of the petitioner, to support its conclusion that habeas relief was required in this case." 36 F. App'x at 798.  In *Griffin* the court merely found that the gap between the potential sentence if convicted and the plea offer was sufficient to merit an evidentiary hearing.  *Id.* at 739.

In this case any presumption that might arise as a result of the disparity in the sentences called for by the plea and by the indictment is refuted by the evidence.  Day's assertion that he would have accepted the government's plea offer if he had known before trial that he could have avoided a twenty-five-year consecutive prison term by doing so, is simply not credible.  The overriding theme from the evidence was that no one was able to convince Day that a plea was in his best interest.  Despite the best efforts of Mr. Phelan,

14

Ms. Turek, the defense investigator, and Day's family to help him understand the significant sentencing consequences that would attach if he were convicted on one or more § 924(c) charges, Day steadfastly refused to consider the plea offers, even when they avoided all § 924(c) charges and carried sentence guidelines ranges of less than three years.

Day made it clear to all who represented him that he wanted to fight the charges and go to trial. He retained Mr. Floyd for the very purpose of taking him to trial. The plea offers that were made while Day was represented by Mr. Floyd were not as advantageous as the previous offers. The only pleas offers received by Mr. Floyd carried a ten-year mandatory minimum consecutive sentence. Moreover, all of the government's plea offers included a duty to cooperate, and both Mr. Phelan and Mr. Floyd testified that Day was adamant in his refusal to cooperate with the government. Day's testimony confirmed that he is still recalcitrant, and that he is now expressing a willingness to enter a plea only because he wants to reduce his sentence, not because he is ready to admit criminal responsibility.

Because Day refused the far more favorable offers presented to him while he was represented by Mr. Phelan and by Ms. Turek, because he hired Mr. Floyd for the purpose of going to trial, because he has never shown any willingness to cooperate with the government, and because he still has no appreciation of his liability, there is no reasonable probability that he would have accepted the plea offers presented to Mr. Floyd. Day has not established that there is a reasonable probability that he would have pleaded guilty if he had known about the government's plea offer.

15

For the reasons stated herein the Court finds that Day has not met either the deficient performance element nor the prejudice element of the *Strickland* test.  He has failed to show that he was denied effective assistance of counsel in violation of the Sixth Amendment. Accordingly, Day's motion for relief pursuant to 28 U.S.C. § 2255 will be denied.

An order consistent with this opinion will be entered.


Date:   June 10, 2008                    /s/ Robert Holmes Bell
                                         ROBERT HOLMES BELL
                                         CHIEF UNITED STATES DISTRICT JUDGE